IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| **KELAY GLEAVE-PEREZ,** <br><br> **Plaintiff,** <br><br> vs. <br><br> **NEUROBEHAVIORAL CENTER FOR GROWTH,** <br><br> **Defendant.** | **MEMORANDUM DECISION AND ORDER** <br><br> Case No. 2:21-cv-765-DAK-DBP <br><br> Judge Dale A. Kimball <br><br> Magistrate Judge Dustin B. Pead |

This matter is before the court on Defendant Neurobehavioral Center for Growth's Motion for Summary Judgment [ECF No. 23]. The court held a hearing on the motion on June 1, 2023. At the hearing, Zachary T. Hadley appeared for Defendant. However, because Plaintiff's counsel did not appear, the court took the matter under advisement without hearing oral argument. After carefully considering the parties' memoranda as well as the facts and law relevant to the pending motions, the court issues the following Memorandum Decision and Order.

## BACKGROUND

This is an employment dispute in which Plaintiff claims harassment based on protected status and discrimination based on race and/or national origin. On November 14, 2019, Defendant hired Plaintiff as a mental health therapist intern. Plaintiff signed all of Defendant's employment documents. On June 5, 2020, Plaintiff's employment with Defendant ended. Plaintiff claims that Defendant ended her employment involuntarily, and Defendant asserts that Plaintiff resigned voluntarily.

Plaintiff claims that while she was driving home from work on June 4, 2020, she received a text message to call Dr. Cardinal, Defendant's owner and CEO, regarding a situation with a former

client and her mother.   Plaintiff called a coworker and explained that she had just gotten off work, that the client in question was not really her client anymore because she had not seen her for four months, and that whoever received the call from the client's mother should have been able to help her.   That evening at approximately 10:00pm, Dr. Cardinal texted Plaintiff directly about the situation, asking Plaintiff to reach out to the client's mother.

Plaintiff asserts that the next morning she texted Dr. Cardinal and said she was sorry for not responding sooner and then started getting ready to come into work.   Dr. Cardinal replied via text for Plaintiff to "Please call me back ASAP."   Plaintiff states that she did not see this text because she was getting ready for work.   On her way into work, Plaintiff states that her car broke down and she called the office manager to inform her that she would be late because of her car problems.   Plaintiff then states that her husband picked her up and took her home because she had cried off all her makeup.   Plaintiff asserts that once she was home, she called Dr. Cardinal and informed her that she was not going to be able to come in to work that day due to her vehicle breaking down.   Plaintiff states that she had still not seen Dr. Cardinal's text to call her back ASAP.

During the telephone call, Plaintiff alleges that Dr. Cardinal yelled at her, asked if she checked her texts and email, and called her irresponsible and unprofessional.   Plaintiff claims that Dr. Cardinal's comments ridiculed and humiliated her.   Plaintiff asserts that she then told Dr. Cardinal that she had sent her at least ten emails during the course of her employment to which she had never received any response.   According to Plaintiff, Dr. Cardinal then said she was done with the conversation and hung up.

Plaintiff alleges that Defendant then deemed her to have resigned.   Plaintiff denies resigning or telling Dr. Cardinal that she was quitting.   Plaintiff claims that Dr. Cardinal later informed her that "We will not be rescinding [our] acceptance of your resignation."   Plaintiff

2

states that on June 10, 2020, she submitted a letter to the office manager, informing her that she had not resigned and had been involuntarily discharged. But Plaintiff told her that she would be willing to work through June 26, 2020. Plaintiff, however, asserts that Defendant nevertheless proceeded to terminate her employment.

Defendant, however, has disclosed numerous emails and texts exchanged by Dr. Cardinal and other employees corroborating Defendant's assertion that Plaintiff resigned. In a text message Dr. Cardinal sent to Plaintiff on June 5, 2021, after the telephone call between Plaintiff and Dr. Cardinal, Dr. Cardinal said: "Hi Keyla I am so sorry NBCG did not meet your expectations. You were awesome w your patients. Please see email so you can go thru the formal process of resignation. We will do everything possible to make the transition w your patients smooth. Please text me or Stacy directly if you are not seeing things done the way you want. I wish you the best." Plaintiff promptly responded, texting "Thks."

Dr. Cardinal then sent an email to a team at NBCG, that included Keyla, stating that "Keyla has decided to leave NBCG. I am very sad about it because she was awesome with patients. I also know there were struggles with communication related to Supervision that were frustrating. I am sorry Keyla did not see the strength and kindness of our team. I think our admin team was in survival mode due to Covid and trying to make sure the clinic could stay afloat. Keyla we wish you the best. Please turn in your letter of resignation to Stacy (or scan) and let us know how we can help transition your patients." Keyla did not respond to this email.

On June 26, 2020, Plaintiff filed a complaint with the Antidiscrimination and Labor Division of the State of Utah Labor Commission, asserting discrimination based on her race and national origin. Plaintiff presented four allegations in her Charge of Discrimination as evidence of discrimination: her exclusion from employee photos, not being provided a private workplace,

3

Defendant's prolonged response times to her request for help, and Defendant's lack of adequate training. Plaintiff admits that the Charge of Discrimination contains this summary but contends that those four allegations are not her only allegations of Defendant's discriminatory treatment. She states that her facts also included other incidents, including coworkers yelling at her and Defendant terminating her employment.

Defendant provided an affidavit in support of its motion for summary judgment stating that none of Defendant's employees, regardless of their job title, had a private office. Plaintiff, however, claims that Giannina Fuentes, Colleen O'Relley, Joey Puntasecca, Pete Conder, Lyndsey Evans, Janelle and others, had their own stable office space.

On November 6, 2020, the UALD issued a Determination and Order, concluding that there was insufficient evidence to support Plaintiff's charge: "The facts in the record . . . indicate that there is No Reasonable Cause to believe Respondent discriminated against Charging Party." That determination concluded the UALD's informal adjudication procedure.

Plaintiff responded to written discovery requests that Defendant propounded. But Defendant did not take Plaintiff's deposition. Defendant states that the only items Plaintiff produced as proof of discrimination are emails regarding the transfer of supervisors, texts between Plaintiff and Dr. Jennifer Cardinal regarding the incident that led to Plaintiff's resignation, emails regarding Defendant's alleged exclusion of Plaintiff from employee photos, and LinkedIn messages between Plaintiff and one of Defendant's former employees.

## DISCUSSION

### Defendants' Motion for Summary Judgment

Defendant moves for summary judgment on both of Plaintiff's claims of hostile work-environment harassment based on race and racial discrimination.

**1. Harassment Based on Protected Status**

"'Title VII forbids employment discrimination on the basis of race or national origin.'" *Herrera v. Lufkin Indus.*, 474 F.3d 675, 680 (10th Cir. 2007) (quoting *Chavez v. New Mexico*, 397 F.3d 826, 831 (10th Cir. 2005)). "Although hostile work environment is not explicitly mentioned in Title VII, it is well established a victim of a racially hostile or abusive work environment may bring a cause of action pursuant to 42 U.S.C. § 2000e-2(a)(1)." *Bolden v. PRC Inc.*, 43 F.3d 545, 550 (10th Cir. 1994). "To survive summary judgment on a claim alleging a racially hostile work environment, [Plaintiff] 'must show that a rational jury could find that the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment,' and that the victim 'was targeted for harassment because of her . . . race[] or national origin.'" *Herrera*, 474 F.3d at 680 (quoting *Sandoval v. City of Boulder*, 388 F.3d 1312, 1326-27 (10th Cir. 2004) (quotation omitted)).

"A plaintiff does not make a showing of a pervasively hostile work environment 'by demonstrating a few isolated incidents of racial enmity or sporadic racial slurs. Instead, there must be a steady barrage of opprobrious racial comments.'" *Id.* (quoting *Chavez*, 397 F.3d at 832. Because this determination can often be fact-intensive and thus difficult to determine on summary judgment, courts "consider the work atmosphere 'both objectively and subjectively, . . . look[ing] at all the circumstances from the perspective of a reasonable person in the plaintiff's position.'" *Id.* (quotations, citations omitted). "A dual standard asks both whether the plaintiff was offended by the work environment and whether a reasonable person would likewise be offended." *Hernandez v. Valley View Hosp. Ass'n*, 684 F.3d 950, 957 (10th Cir. 2012). "[W]hether the complained of conduct is sufficiently pervasive as to create a hostile work

environment must be determined from the totality of the circumstance since no single factor is required." *Sprague v. Thorn Americas, Inc.*, 129 F.3d 1355, 1365 (10th Cir. 1997).

Defendants argue that summary judgment is appropriate in this case because Plaintiff has not demonstrated that Defendant subjected her to unwelcome and unwanted conduct based on race and/or national origin, or that the alleged harassment was sufficiently severe or pervasive as to alter the terms and conditions of her employment.

Plaintiff does not claim that any racial comments were made to her or that she heard any being made in the workplace. Plaintiff alleges that a coworker told her to tell her patient to be quiet, her supervisor told her she was irresponsible and unprofessional for not assisting a former patient after hours, that she did not have her own office, that she was not included in office photographs, that she did not receive the level of supervision that others received, her supervisor did not return several emails, and she felt that she was being left alone. None of these complaints suggest a racially hostile work environment. Even taken together, they are merely normal workplace complaints. Stating that her coworkers yelled at her to keep her patients quiet or yelled at her that she was being irresponsible or unprofessional does not amount to legally-cognizable "hostile work environment." "'Title VII does not establish a general civility code for the workplace. Accordingly, the run-of-the-mill boorish, juvenile, or annoying behavior that is not uncommon in American workplaces is not the stuff of a Title VII hostile work environment claim.'" *Hernandez*, 684 F.3d 950, 957 (10th Cir. 2012) (quoting *Morris v. City of Colo. Springs*, 666 F.3d 654, 663-64 (10th Cir. 2012)).

The court cannot find a single hostile environment case surviving summary judgment where there was no overtly racial or arguably racial remark made during the course of the plaintiff's employment. In *Bolden*, the Tenth Circuit "held that only two overtly racial comments

6

and one arguably racial remark over the course of the plaintiff's eight years of employment did not constitute pervasive conduct." *Smith v. Northwest Fin. Assocs.*, 129 F.3d 1408, 1414 (10th Cir. 1997) (explaining that isolated incidents of harassment, while inappropriate and boorish, do not constitute pervasive conduct).  While Plaintiff may have subjectively believed that the way she was treated was due to her race, she does not assert any objective evidence linking her treatment and her race.  The evidence the parties submitted demonstrates that there was confusion regarding office photographs, but it is clear that she was invited to participate in being photographed. Plaintiff also provided emails exchanged between supervisors expressing her concern of inadequate training.  But again, there is no evidence that the alleged lack of training was based on Plaintiff's race.  Rather, it is obviously a biproduct of a busy workplace.  Plaintiff has not sufficiently demonstrated evidence, subjective or objective, from which a rational jury could find that she was subjected to unwelcome conduct based on her race or that her workplace was permeated with discriminatory intimidation, ridicule, and insult that was sufficiently severe or pervasive to alter her conditions of employment.  Therefore, the court grants Defendant's Motion for Summary Judgment on Plaintiff's hostile environment claim.

**2.  Discrimination Based on Race and/or National Origin**

"In order to establish a claim of discrimination based on race and/or national origin, Plaintiff must allege facts which establish, or tend to establish a prima facie case—namely, that" (1) she is a member of a protected class; (2) she was qualified for the position she held; (3) Defendant subjected her to an adverse employment action; and (4) the circumstances surrounding the adverse action give rise to an inference of discrimination on the basis of race and/or national origin." *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).

Many of Plaintiff's claimed adverse employment actions do not amount to adverse

employment actions under controlling law. An adverse employment action occurs when an employer's conduct "constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Sanchez v. Denver Pub. Schs.*, 164 F.3d 527 (1998). Being excluded from photos, cancelled team meetings, lack of private office space, sporadic supervision and training, and ignored emails are not adverse employment actions. None of these things alters the terms of her employment. The only adverse employment action in this case is Plaintiff's alleged termination.

In this case, the parties dispute whether Plaintiff quit or was terminated. Plaintiff states that she did not voluntarily resign. But Defendant has disclosed numerous emails and texts exchanged by Dr. Cardinal and other employees corroborating its assertion that Plaintiff resigned. In a text message Dr. Cardinal sent to Plaintiff on June 5, 2020, Dr. Cardinal said: "Hi Keyla I am so sorry NBCG did not meet your expectations. You were awesome w your patients. Please see email so you can go thru the formal process of resignation. We will do everything possible to make the transition w your patients smooth. Please text me or Stacy directly if you are not seeing things done the way you want. I wish you the best." Plaintiff promptly responded, texting "Thks."

Dr. Cardinal then sent an email to a team at NBCG, stating that "Keyla has decided to leave NBCG. I am very sad about it because she was awesome with patients. I also know there were struggles with communication related to Supervision that were frustrating. I am sorry Keyla did not see the strength and kindness of our team. I think our admin team was in survival mode due to Covid and traying to make sure the clinic could stay afloat. Keyla we wish you the best. Please turn in your letter of resignation to Stacy (or scan) and let us know how we can help transition your

patients."

Plaintiff responded to the first text referring to her resignation by stating "thanks," and did not respond to the email to the team referring to her resignation. However, Plaintiff argues that she sent a letter to the office manager a few days later stating that she did not voluntarily resign, and Dr. Cardinal told her that "we will not be rescinding [our] acceptance of your resignation." However, even if the court were to agree with Plaintiff that Defendant terminated her employment or that Defendant's refusal to rescind the acceptance of her resignation constituted an adverse employment action, to survive summary judgment, she still needs to demonstrate that the circumstances surrounding her termination give an inference of discrimination on the basis of race.

The disagreement between Plaintiff and Dr. Cardinal that led to her alleged termination was regarding patient care, which is a legitimate non-discriminatory concern. Plaintiff does not dispute that this disagreement led to her termination or resignation that Defendant did not allow her to rescind. Plaintiff may disagree with whether she should be asked to work after hours, but if Defendant terminated her for failure to do so, that does not give rise to an inference of discrimination. There is no evidence that Plaintiff was the only employee asked to work after hours or that she was being singled out to work after hours because of her race. Plaintiff raises a host of other workplace complaints, such as the lack of a private office, failure to return emails, sporadic supervision, and not being included in photographs, but none of these complaints give rise to an inference that Plaintiff was terminated due to her race. Plaintiff claims that a white male was given more supervision and training than she was. But the evidence she submits demonstrates that he also felt like he was not given enough training or supervision. There is no evidence to suggest that Defendant's treatment of Plaintiff was anything other than the product of a busy workplace. Plaintiff may feel that her termination was due to her race, but she needs some

9

sort of evidence to corroborate her feeling.   Plaintiff has failed to provide any nexus between her treatment and her race.   Therefore, she cannot make out a claim of racial discrimination.   Accordingly, the court grants Defendant's Motion for Summary Judgment on Plaintiff's racial discrimination claim.

## CONCLUSION

Based on the above reasoning, Defendant Neurobehavioral Center for Growth's Motion for Summary Judgment [ECF No. 23] is GRANTED.   Because this disposes of all the claims in the case, the court will enter judgment and close the case.

DATED this 28th day of June, 2023.

BY THE COURT

_____
DALE A. KIMBALL
United States District Judge